1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JEFFREY BREONE GRAY,

11            Petitioner,                 No. 2: 07-cv-1545 FCD KJN P

12       vs.

13   F. B. HAWS, et al.,

14            Respondents.          FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17            Petitioner is a state prisoner proceeding without counsel with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2004 conviction for

19   second degree murder.  Petitioner is serving a sentence of 40 years to life.

20            This action is proceeding on the amended petition filed September 16, 2008.

21   (Dkt. No. 13.)  Petitioner raises the following claims: 1) speedy trial violation; 2) improper

22   admission of evidence regarding prior conviction; 3) jury instruction error; 4) violation of

23   Confrontation Clause; and 5) prosecutorial misconduct.

24            After carefully reviewing the record, the undersigned recommends that the

25   petition be denied.

26   ////

1

II.  Anti-Terrorism and Effective Death Penalty Act ("AEDPA")

In Williams (Terry) v. Taylor, 529 U.S. 362 (2000), the Supreme Court defined the operative review standard in a habeas corpus action brought pursuant to 28 U.S.C. § 2254. Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law.  Id. at 405.  "Contrary to" clearly established law applies to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law; or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Id. at 407-08.  It is this prong of the AEDPA standard of review which directs deference be paid to state court decisions.  While the deference is not blindly automatic, "the most important point is that an unreasonable application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 410-11 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  Woodford v. Viscotti, 537 U.S. 19 (2002).

"Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court.  Wright v. Van Patten, 552 U.S. 120 (2008).  Thus, extrapolations of settled law to unique situations will not qualify as clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to

1  inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by

2  unnecessary showing of uniformed guards does not qualify as clearly established law when

3  spectators' conduct is the alleged cause of bias injection).

4          The state courts need not have cited to federal authority, or even have indicated

5  awareness of federal authority, in arriving at their decision.  Early v. Packer, 537 U.S. 3 (2002).

6  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an

7  unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is

8  one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v.

9  Andrade, 538 U.S. 63, 75-76 (2003).  Moreover, the established Supreme Court authority

10 reviewed must be a pronouncement on constitutional principles, or other controlling federal law,

11 as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v.

12 Packer, 537 U.S. at 9.

13         However, where the state courts have not addressed the constitutional issue in

14 dispute in any reasoned opinion, the federal court will independently review the record in

15 adjudication of that issue.  "Independent review of the record is not de novo review of the

16 constitutional issue, but rather, the only method by which we can determine whether a silent state

17 court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

18 2003).

19         In this case, the California Court of Appeal was the last state court to issue a

20 reasoned decision addressing petitioner's claims.  (Respondent's Lodged Documents 7, 9.)

21 Accordingly, the undersigned considers whether the denial of those claims by the California

22 Court of Appeal was an unreasonable application of clearly established Supreme Court authority.

23 Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000) (when reviewing a state

24 court's summary denial of a claim, the court "looks through" the summary disposition to the last

25 reasoned decision).

26 ////

III.  Background

The opinion of the California Court of Appeal contains a factual summary.  After independently reviewing the record, the undersigned finds this summary to be accurate and adopts it herein:

> The primary prosecution witness was the victim's most recent roommate, with whom she had come to live a couple of weeks before the murder. On the day of the shooting, the victim had returned home in the late afternoon with a car that the roommate's father had rented. She asked the roommate to come along with her while she drove the defendant home (who was outside in the car). This was the first time that the roommate had met the defendant.
>
> The victim drove to an apartment complex. She explained to the defendant that they had to return the car to the roommate's father. The defendant refused to get out of the car. The victim went into the apartment complex and returned with the defendant's cousin, who joined the roommate in the back seat. The victim drove around, seemingly aimlessly. Eventually, they returned to the apartment complex. The defendant still would not leave the car; he told the victim that the roommate and cousin could follow her in the defendant's car.
>
> The victim continued to drive with no apparent destination. It appeared to the roommate that the victim and the defendant were having an argument. Eventually, the cars stopped at a gas station, at which point the victim told her roommate that she wanted to go to the cemetery to see the grave of her mother, after which they would go to a restaurant to eat.
>
> When they got to the cemetery, they followed a road to the rear. The victim got out of the car, carrying only a purse, and walked quickly toward the fence. The defendant got out of the car holding a small black gun. He started walking toward the victim. The roommate could see his hands make the motion of cocking the gun.
>
> The defendant tried to grab the victim's neck. She shrugged him off but he took hold of her. The two of them struggled. The roommate did not see the victim's hand on the gun at any point. The music was on in the car and the windows up, so the roommate could not hear anything. As the victim broke away from the defendant, the roommate heard the sound of a shot. The victim staggered away. The defendant walked back to the car with the purse and gun in hand, and told his cousin and the roommate that someone needed to get the victim to a hospital. The roommate ran to the victim and dragged her (without assistance from the men) to the rental car, but could not get her inside. She demanded the keys and the victim's purse from the men. Unable to summon assistance on a cell phone, she decided to drive to the nearby home of her grandmother to make the call.
>
> The bullet entered the victim's neck and exited the right side of her back in essentially a straight line. The angle of the wound indicated it had been fired from someone standing over the victim, or shooting at a bent-over victim. The bullet perforated a major vein to her heart and two of the three lobes of her right lung.

4

Her chest cavity was filled with a quart of blood. Her blood-alcohol level was .05, and a significant amount of methamphetamine was in her system. There was also a pipe in her pocket.

A resident of an apartment complex bordering the cemetery was in the process of taking laundry in two or three trips to his car. He heard what sounded like a young woman nearby who was crying, gasping, and gurgling. It sounded as if she was saying, "[W]hy is this happening? Why are you doing this to me? Why? Don't leave me here. I don't want to die." At first he had not paid much notice because he had heard mourners keening on other occasions, but there was something that caught his attention. He could see two cars in the cemetery, but no people were visible outside of them. When he returned from the laundromat shortly afterward and learned police were going through the complex, he sought them out to tell them what he had heard.

According to a detective who acted as an investigator of the crime scene, the evidence closely corroborated the roommate's account (which he had not heard before writing his report). An ejected unfired casing was near where the roommate said she saw the defendant cock the gun, a pool of blood was near where she said the victim fell, and there were blood drops along where she said she had dragged the victim. He also found an expended bullet; the angle at which it had hit the ground was consistent with it passing through the torso of someone bent over somewhere between fully horizontal and fully upright.

The defense strategy paralleled that of defense attorney Billy Flynn in Chicago. (Kander & Ebb (1975) "We Both Reached For The Gun.") (FN1)  Defendant's cousin testified that after the victim had been driving around making stops (which he assumed were related to selling drugs), he followed her in the other car to the cemetery. As he pulled up behind the rental car, he could see the victim and the defendant already struggling over a gun. The victim was holding the handle and the defendant had hold of the barrel. The gun went off in a matter of seconds after he arrived. A witness (FN2) picnicking near his aunt's grave some 450 feet away stated that the defendant was not holding anything when he got out of the car to follow the victim. There was something in the victim's right hand that he assumed was a gun because the defendant backed off when she raised it. They began to struggle over whatever was in her left hand, and the witness claimed he heard the defendant ask if the victim was going to shoot him. Then there was a shot. The defendant and a woman from the other car appeared to be helping the victim toward the cars. He could not see the body on the ground from his location; assuming all was well, he went to get food at a nearby store. On his return, he saw the police. He had gotten a ride to court from the defendant's girlfriend.

> FN1. "Oh yes, oh yes, oh yes, we both-/Oh yes, we both-oh yes, we both reached for/The gun, the gun, the gun, the gun. Oh yes, we/both reached for the gun, for the gun."

> FN2. This witness, described as homeless, was unavailable for the retrial. The parties read the transcript of his testimony from the first trial into the record.

The defendant testified. He had known the victim since childhood. Although they

had been in a sexual relationship that produced a child, he did not consider her a girlfriend. She had been a drug abuser since age 13, and he acted as the wholesaler for her drug enterprise. He was unhappy that her use of drugs during her pregnancy with what he assumed was his child resulted in dependency proceedings. They had spent the day calling on the victim's customers, adding the roommate and the cousin (and the defendant's car) to their party as the day progressed. The victim had been irritable with the defendant as they drove, believing him to have sequestered their child. She announced that she wanted to return to the cemetery (having already visited it earlier in the day with the defendant). At the cemetery, she walked toward her mother's grave. The defendant got out of the car to follow her. He did not have a gun, and denied making any motion resembling the cocking of a gun. When he tried to guide her back to the car, she pulled out a gun. They struggled over it for about a minute before it discharged accidentally. He did not intend at any time to shoot her. She did not say anything akin to what the witness heard in the neighboring apartment complex.

(Respondent's Lodged Document 7, pp. 2-5.)

IV.  Discussion

     A.  Speedy Trial

     Petitioner contends that his right to a speedy trial was violated.  Petitioner's first trial ended in a mistrial on May 19, 2003, after the jury could not reach a verdict.  (CT at 175.) Petitioner's retrial began on June 7, 2004.  (CT at 190.)  Petitioner contends that this almost one year delay in his retrial violated his right to a speedy trial.

     "The Sixth Amendment guarantees that in all criminal prosecutions the accused shall enjoy the right to a speedy trial."  Doggett v. United States, 505 U.S. 647, 651 (1992).  The Supreme Court has articulated a four-part test to determine when the delay has violated a defendant's right to a speedy trial.  The court must balance: (1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted the right; and (4) whether the defendant suffered prejudice as a result of the delay.  Barker v. Wingo, 407 U.S. 514, 530 (1972);  McNeely v. Blanas, 336 F.3d 822, 826 (9th Cir. 2003).  However, the Constitution requires only that the state make a good-faith, diligent effort to bring a defendant to trial in a timely manner.  McNeely, 336 F.3d at 826.

1    "The length of the delay is to some extent a triggering mechanism. Until there is

2    some delay which is presumptively prejudicial, there is no necessity for inquiry into the other

3    factors that go into the balance." Barker, 407 U.S. at 530; McNeely, 336 F.3d at 826 (noting that

4    a substantial delay "triggers a Barker inquiry"). However, a "delay attributable to the defendant's

5    own acts or to tactical decisions by defense counsel will not bolster defendant's speedy trial

6    argument." McNeely, 336 F.3d at 827.

7    As discussed above, petitioner's retrial commenced approximately one year after

8    the conclusion of his first trial. See Blackburn v. United States, 564 F.2d 332, 334 (9th Cir.

9    1977) (when a case is set for retrial following a mistrial, the defendant's speedy trial right begins

10   to run again from the date of the mistrial). This delay was presumptively prejudicial. See

11   Doggett, 505 U.S. at 652 n. 1 (noting that lower courts have generally found delays to be

12   "presumptively prejudicial" when they approach a year). Accordingly, the other Barker factors

13   must be considered.

14   Out of the eight requested continuances between the original trial and the retrial,

15   seven were attributable to defense counsel. The first continuance was sought on July 14, 2003,

16   by both defense counsel and the prosecutor on grounds that they needed the transcript from the

17   first trial to prepare for the retrial. (Augmented Reporter's Transcript ("ART") at 582.) At this

18   time, petitioner stated that he did not waive time and made a Marsden motion. (Id.) This motion

19   was denied.[1] (Clerk's Transcript ("CT") at 11.)

20   On August 27, 2003, petitioner's counsel sought the second continuance on

21   grounds that he was in trial on another case and still had not received the trial transcript. (ART at

22   608.) At that time, petitioner's counsel told the court that he had discussed the matter with the

23   Defense Panel and had been advised that they would not be able to provide another attorney to

24   try the case in sixty days. (ART at 609.) At that hearing, petitioner stated that he would not

25

26   [1] The lodged record in the instant case does not contain the transcript from this Marsden motion. Consideration of petitioner's claims does not require review of that transcript.

7

waive time.  (ART at 610.)

On October 22, 2003, defense counsel sought a continuance because he was in trial on another case.  (ART at 612.)  Defense counsel requested a continuance until January 6, 2004.  (ART at 613.)  He told the court that the director of the Defense Panel had told him that the panel was extremely short staffed and was unable to get any other lawyer ready to try the case in the time that he expected to be ready.  (Id.)  Defense counsel acknowledged that he had received the transcript from petitioner's first trial during the previous week.  (ART at 614.)  On the record, the court stated that the Defense Panel was unable to find a lawyer with the necessary level of competency to handle the charges against petitioner.  (ART at 616.)  The matter was continued to January 6, 2004.  (Id.)

On January 6, 2004, an attorney standing in for defense counsel stated that he sought a continuance on counsel's behalf because he was still in the "big Fijian" case.  (ART at 618.)  The court granted the continuance to March 4, 2004.  (ART at 619.)

At a trial status conference on February 20, 2004, petitioner's trial counsel told the court that he anticipated his current trial to end in mid-March.  (ART at 619.)  Petitioner told the court that he did not agree to this continuance.  (ART at 622.)  Petitioner's counsel stated that his current trial involved six defendants and 68 counts.  (ART at 622.)  The court continued petitioner's retrial to March 29, 2004.  (ART At 623.)

On March 29, 2004, petitioner's counsel sought another continuance because he was still in trial.  (ART at 625.)  The court granted a continuance to May 3, 2004.  (ART at 626.)  On May 3, 2004, counsel sought his final continuance because he was still in trial.  (ART at 630.)  Petitioner told the court that he did not waive time and asked for dismissal of the charges due to a speedy trial violation.  (Id.)  The court denied this motion and granted the continuance to May 27, 2004.  (Id.)

On May 27, 2004, the prosecutor sought a continuance because he was in trial.  (ART at 632.)  Petitioner objected on grounds that his right to a speedy trial was being violated.

1  (Id.)  The court granted the motion and continued the trial to June 3, 2004.  (ART at 634.)  On

2  June 3, 2004, the trial was continued to June 7, 2004, because the prosecutor was still in trial.

3  (ART at 636.)  Trial began on June 7, 2004.

4           The delay in petitioner's trial was primarily caused by scheduling conflicts of

5  defense counsel.   In addition, based on counsel's honest attempt to calculate the length of his

6  "Fiji" trial, no other defense counsel could be brought up to speed soon enough to represent

7  petitioner at trial.  These neutral reasons weigh less heavily than would deliberate misconduct by

8  the government.  See Barker, 407 U.S. at 531.[2]

9           Turning to the third Barker factor, the record reflects that petitioner objected to

10  the continuances that led to the delay in his retrial at every opportunity he received.  This factor

11  weighs in petitioner's favor.

12           In his opening brief in state court, petitioner addressed the issue of prejudice.

13  Petitioner argued that he was prejudiced because as a result of this delay, the defense could not

14  locate witness Caldwell, a homeless man.  (Respondent's Lodged Document 1, p. 22.)  Petitioner

15  argued that as a result of not being able to locate Caldwell, his testimony from the first trial had

16  to be read to the jury at the second trial.  (Id., pp. 22-23.)  Petitioner argued,

17    Receiving only a rote, emotionless reading of a prior testimony, the jury at the
18    second trial could not observe Caldwell's demeanor and judge his credibility
       when he insisted it was the woman and not the man who held the other at
       gunpoint in this case.  The first jury, which had been able to see and hear
19    Caldwell, deadlocked, unable to reach unanimity with respect to the murder
       charge or any other of the lesser included offenses.  Had appellant been retried in
20    a timely fashion, the second jury, too, would have received the exculpatory
       evidence the first jury received and it, too, would not have found appellant guilty

21

22           [2]  "Closely related to length of delay is the reason the government assigns to justify the
     delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt
23  to delay the trial in order to hamper the defense should be weighted heavily against the
     government. [Footnote omitted.]  A more neutral reason such as negligence or overcrowded
24  courts should be weighted less heavily but nevertheless should be considered since the ultimate
     responsibility for such circumstances must rest with the government rather than with the
25  defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate
     delay."  Barker v. Wingo, 407 U.S. at 531.

26

1    of murder.

2    Moreover, if the retrial had not been unduly delayed and Caldwell had appeared
     before the second jury, appellant would not have deemed it necessary to take the
3    stand and thereby attempt to make up for Caldwell's absence.  As a result, the jury
     would not have learned that appellant was a member of the Crips and appellant
4    would not have been impeached with evidence that he previously killed a man.
     Neither would he have been smeared with references to his time in YA and his
5    dishonorable discharge from parole.  The second jury would have been spared all
     this catastrophic evidence, just as the first jury was.  It is thus likely that the
6    second jury would have acquitted appellant of murder.

7    (Id., p. 23.)

8    The California Court of Appeal rejected petitioner's claim of prejudice for the

9    reasons stated herein:

10   The sole prejudice to which the defendant points in the present case (other than
     the generic complaint about the effect of the passage of time on his ability to
11   defend) was the absence of live testimony from the homeless witness, contending
     this forced him to testify in his own behalf.  He does not, however, identify any
12   factual basis in the record for this causal relationship.  His citation to cases in
     which prejudice was present is also inapposite, as it involves situations unlike the
13   present in which no testimony whatsoever was available in the stead of an absent
     witness.  (People v. Lawson (2005) 131 Cal.App.4th 1242, 1246-1247; People v.
14   Cuccia (2002) 97 Cal.App.4th 785, 790-792.)  We will not indulge the speculation
     that the jury was unimpressed with evidence received without a first-hand
15   opportunity to view the absent witness.  Finally, given the fact of his conviction,
     his lament about enduring time in jail awaiting retrial has little impact, as it
16   simply delayed his transfer from local to state custody.

17   (Respondent's Lodged Document 7, pp. 9-10.)

18   The undersigned agrees with the California Court of Appeal's analysis of

19   petitioner's claim of prejudice.  There is no causal relationship between the reading of Caldwell's

20   testimony to the jury and petitioner's decision to testify at the second trial.  Moreover,

21   petitioner's claim that the second jury was unimpressed with Caldwell's read testimony is

22   speculative.  For these reasons, petitioner has not demonstrated prejudice.

23   Viewing all of the factors together, the undersigned finds that petitioner was not

24   denied his right to a speedy trial.  The delay was barely long enough to trigger the speedy trial

25   inquiry, trial counsel's involvement in another trial was the primary reason for the delay, and

26   petitioner fails to show prejudice.

The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

### B. Confrontation Clause

Petitioner argues that admission of four hearsay statements of the victim regarding prior instances of domestic violence by petitioner toward her violated his right to confrontation. The California Court of Appeal denied this claim for the reasons stated herein:

> Over defense objections, the trial court admitted four hearsay statements of the victim to two friends about instances of domestic violence on the part of the defendant toward her. The defendant contends this violated his right to confrontation.
>
> The victim moved in with a friend from childhood upon being released from prison in 2001. The defendant spent the night with the victim on several occasions. Within a month after the victim moved in, the friend observed scrapes, which the victim told her were the result of the defendant pushing her out of a car. Once, during a phone conversation with the defendant, the victim handed the phone to her friend, who heard the defendant angrily threaten to kill the victim because she had used drugs while pregnant with what the defendant believed to be his child, and this resulted in the declaration of a dependency for the infant. The victim told her this was part of a recent pattern of increasingly aggravated threats. Finally, a month or so before her death, the friend found the victim crying in the bathroom and bleeding from her mouth; she said the defendant had "socked" her. (FN4)
>
> > FN4. The defendant denied ever throwing the victim out of a car or punching her in the mouth.
>
> The victim's roommate at the time of the shooting also testified that the victim jumped out of the rental car at one point (while the roommate had been following in the other car) because the defendant had hit her in the head with a gun. The victim was angry and on the verge of tears. The roommate had not noticed any physical confrontation between the victim and the defendant when following them, and did not observe any marks on the victim's head. (FN5)
>
> > FN5. The defendant denied striking her with a gun.
>
> The prosecutor sought admission of these incidents as prior acts of domestic violence (Evid.Code, § 1109), and sought to overcome the hearsay problems through reliance on the exceptions for an excited utterance and inflicted or threatened physical injury of a declarant (id. at §§ 1240, 1370). The defendant registered a continuing objection to the lack of foundation for finding a sufficient relationship between the defendant and the victim (id. at § 1109, subd. (d)(3)) and to a violation of his right of confrontation under Crawford v. United States (2004)

541 U.S. 36 [158 L.Ed.2d 177] (<u>Crawford</u> ).

At the threshold, the defendant renews his objection under <u>Crawford</u> to a violation of his right to confront witnesses. He misapprehends the reach of <u>Crawford</u>.

<u>Crawford</u> considered the interplay between the right of confrontation under the federal Constitution and the rules of hearsay, noting that the former would condemn evidence that is otherwise admissible under exceptions to the latter if it is nonetheless akin to the abuses under British common law at which the constitutional provision was aimed. (541 U.S. at pp. 50-51.) Thus, regardless of whether hearsay evidence is admissible pursuant to an exception, a "testimonial" extrajudicial statement is admissible only if the witness is unavailable and the defendant had a previous opportunity to cross-examine the witness. If the extrajudicial statement is not testimonial, then the ordinary principles of hearsay apply. (<u>Id</u>. at pp. 59, 68.) Here, the defendant never had the opportunity to cross-examine the victim about these extrajudicial statements to her friends. Thus, the question is whether the statements were testimonial in nature.

<u>Crawford</u> itself refused to give a comprehensive definition of "testimonial." (541 U.S. at p. 68 & fn. 10.) It did note the existence of different ways of formulating the principle, among which was a broad definition that the National Association of Criminal Defense Lawyers (NACDL) urged in an amicus brief: statements made under circumstances reasonably leading to a belief that they would be available for use in a future trial. (<u>Id</u>. at pp. 51-52.) The defendant seizes upon this formulation to urge that the victim's statements to her friends were testimonial. We disagree. In its extensive discussion of the historical abuses that the right of confrontation addressed, <u>Crawford</u> repeatedly invoked the specter of solemn statements made to government officials engaged in ex parte investigations pursuant to the prosecution of an individual. Thus, "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (<u>Id</u>. at p. 51.) Given this focus, we do not think it likely that <u>Crawford</u> was endorsing the broad reach of the proposed NACDL definition. We conclude the circumstances under which the victim made these statements to her friends does not intrude upon the core concern of the right to confrontation, and thus are not testimonial.

The defendant also asserts that <u>People v. Sisavath</u> (2004) 118 Cal.App.4th 1396, applied <u>Crawford</u> to statements to a private party. The case is inapposite. It came to the unremarkable conclusion that the victim's complaints to a police officer about sexual abuse were testimonial. (<u>Id</u>. at p. 1402.) It also found that the victim's statements to a trained "'forensic interview specialist'" at a facility "designed and staffed for interviewing children suspected of being victims of abuse" after the initiation of charges were testimonial. (<u>Id</u>. at pp. 1400, 1402-1403.) This has no bearing on conversations with friends.

In order for statements relating to domestic abuse to come within the hearsay exception, they must (among other criteria) be contemporaneous with the infliction or threat of physical injury, trustworthy, and "made in writing" (or electronically recorded, or made to medical personnel or law enforcement officials). (Evid.Code, § 1370, subd. (a)(3)-(a)(5).) The defendant argues that the victim's statements to the witnesses do not satisfy these criteria, in particular the

1    requirement of a writing or a recording.

2    As we have noted above, however, defense counsel did not object on these
     grounds in the trial court. He argued only that Crawford made the statements
3    inadmissible in any event, and that the defendant and victim did not have a dating
     or engagement relationship. The defendant has forfeited this argument on appeal.
4    (Evid.Code, § 353; People v. Partida (2005) 37 Cal.4th 428.)

5    Even if we accept the defendant's forfeited argument, there still is not any basis
     for reversing his convictions. The victim's statement to her current roommate
6    about being hit in the head with a gun was a spontaneous statement, the roommate
     having laid an adequate foundation for its contemporaneous nature and the degree
7    to which the blow had upset the victim; the absence of corroboration that the
     defendant identifies is immaterial (as are the musings contained in Crawford that
8    he cites on the issue of spontaneous testimonial declarations). The same is true of
     the victim's statement to her former roommate when found bleeding from the
9    mouth as the result of an attack from the recently departed defendant. The
     defendant's threats that the former roommate overheard on the phone are those of
10   a party declarant. (Evid.Code, § 1220.) In light of the admissibility of these
     incidents, it is not reasonably probable that the defendant would have had a more
11   favorable result if the other two incidents - for which we do not discern any
     applicable hearsay exception - had been excluded.

12

13   (Respondent's Lodged Document 7, pp. 12-17.)

14          The Confrontation Clause requires that a defendant in a criminal prosecution

15   "enjoy the right ... to be confronted with the witnesses against him."  U.S. Const. Amend. VI.  In

16   Crawford v. Washington, the Supreme Court determined that admissibility of an unavailable

17   declarant's out-of-court statements depends on whether the statements were "testimonial" in

18   nature.  Crawford, 541 U.S. 36, 38 (2004) ("Where testimonial evidence is at issue ... the Sixth

19   Amendment demands ... unavailability and a prior opportunity for cross-examination.").  Thus,

20   as noted by the California Court of Appeal, to decide whether petitioner's Confrontation Clause

21   rights were violated, the court must first determine whether the statements regarding his prior

22   acts of domestic violence were "testimonial" within the meaning of Crawford.

23          While the Supreme Court in Crawford "le[ft] for another day any effort to spell

24   out a comprehensive definition of 'testimonial,'" the Court provided some guidance for

25   ascertaining whether evidence is testimonial.  Crawford, 541 U.S. at 68.  First, the Court

26   observed that "[a]n accuser who makes a formal statement to government officers bears

13

1    testimony in a sense that a person who makes a casual remark to an acquaintance does not." Id. at

2    51.  The Court next offered three "formulations of [the] core class of 'testimonial' statements":

> [1] ex parte in-court testimony or its functional equivalent - that is, material such
> as affidavits, custodial examinations, prior testimony that the defendant was
> unable to cross-examine, or similar pretrial statements that declarants would
> reasonably expect to be used prosecutorially, [2] extrajudicial statements ...
> contained in formalized testimonial materials, such as affidavits, depositions,
> prior testimony, or confessions, [3] statements that were made under
> circumstances which would lead an objective witness reasonably to believe that
> the statement would be available for use at a later trial[.]

8    (Id. at 51-52.)

9            The Court also gave examples of clearly testimonial statements-"prior testimony

10   at a preliminary hearing, before a grand jury, or at a former trial; and ... police interrogations."

11   Id. at 68.

12           In the instant case, the at-issue statements were "casual remarks" made to friends.

13   Crawford, 541 U.S. at 51.  There is no evidence suggesting that the victim made these statements

14   in anticipation of a criminal prosecution.  Id.  Because Crawford did not speak to "whether and

15   when statements made to someone other than law enforcement personnel are 'testimonial,'"

16   Davis v. Washington, 547 U.S. 813, 823 n. 2 (2006), the California Court of Appeals' decision

17   was not an objectively unreasonable application of federal law, as defined by the Supreme Court.

18   Accordingly, admission of these statements did not violate the Confrontation Clause.

19           Petitioner further argues that admission of the victim's statements regarding his

20   prior acts of domestic violence did not fall within the state law domestic abuse hearsay

21   exception.[3]  The Supreme Court has reiterated the standards of review for a federal habeas court.

22   Estelle v. McGuire, 502 U.S. 62 (1991).  In Estelle v. McGuire, the Supreme Court reversed the

23   decision of the Court of Appeals for the Ninth Circuit, which had granted federal habeas relief.

24   

---

25        [3] Although the California Court of Appeal addressed the merits of this state law claim, it
     found this claim waived based on counsel's failure to raise an objection to this evidence based on
26   state law.   Respondent does not argue that this claim is waived.

1   The Court held that the Ninth Circuit erred in concluding that the evidence was incorrectly

2   admitted under state law since, "it is not the province of a federal habeas court to reexamine state

3   court determinations on state law questions." <u>Id.</u> at 67-68.  The Court re-emphasized that

4   "federal habeas corpus relief does not lie for error in state law." <u>Id.</u> at 67, citing <u>Lewis v. Jeffers</u>,

5   497 U.S. 764 (1990); and <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984) (federal courts may not grant

6   habeas relief where the sole ground presented involves a perceived error of state law, unless such

7   error is so egregious as to amount to a violation of the Due Process or Equal Protection clauses of

8   the Fourteenth Amendment).

9        The Supreme Court further noted that the standard of review for a federal habeas

10  court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of

11  the United States (citations omitted)." <u>Id.</u> at 68.  The Court stated that in order for error in the

12  state trial proceedings to reach the level of a due process violation, the error had to be one

13  involving "fundamental fairness," <u>id</u>. at 73, and that "we 'have defined the category of infractions

14  that violate "fundamental fairness" very narrowly.'" <u>Id.</u> at 73.  Habeas review does not lie in a

15  claim that the state court erroneously allowed or excluded particular evidence according to state

16  evidentiary rules.  <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919 (9th Cir. 1991).

17       As discussed above, the California Court of Appeal found that admission of two

18  of the incidents met the state law domestic abuse hearsay exception, but that two of the incidents

19  did not.  The California Court of Appeal found that in light of the admissibility of two of the

20  incidents, it is not reasonably probable the outcome of the trial would have been different had the

21  two incidents not falling within the hearsay exception been excluded.  Based on the reasoning of

22  the California Court of Appeal addressing this state law claim, the undersigned finds no violation

23  of fundamental fairness in connection with admission of the victim's statements regarding

24  petitioner's prior acts of domestic violence.  The denial of this claim was not an unreasonable

25  application of clearly established Supreme Court authority.

26       For the reasons discussed above, this claim should be denied.

C.  Admission of Evidence re: Prior Conviction

Petitioner argues that the trial court erred in permitting the prosecution to impeach him with his 1990 juvenile conviction for voluntary manslaughter.  The California Court of Appeal denied this claim for the reasons stated herein:

> The trial court ruled that the defendant could be impeached with his 1990 juvenile adjudication for the crime of voluntary manslaughter. During his cross-examination, the defendant admitted that at 15, he killed his mother's boyfriend because the latter was beating the defendant and his mother, and thereafter served a term in the Youth Authority for voluntary manslaughter. The defendant now contends the court erred because voluntary manslaughter is not a crime of moral turpitude.
>
> People v. Castro (1985) 38 Cal.3d 301 (Castro) held that a felony conviction is admissible to impeach the credibility of a witness "if the least adjudicated elements of the conviction necessarily involve moral turpitude." (Id. at p. 317.) It suggested that any difficulties of making this analysis "may be ameliorated by ... considerable bodies of law concerning the characterization of felonies as involving or not involving moral turpitude" (and included a specific reference to case law involving deportations and attorney discipline). (Id. at p. 316, fn. 11.)
>
> People v. Parrish (1985) 170 Cal.App.3d 336, 349-351, and People v. Coad (1986) 181 Cal.App.3d 1094, 1106-1110, addressed this issue at length, concluding that voluntary manslaughter - which involves an intentional killing - reflected the necessary readiness to do evil amounting to moral turpitude. Coad found that case law involving attorney discipline (FN6) provided little guidance on this issue, because the narrow concern with the fitness to practice law does not reflect the policies underlying the impeachment of the credibility of a witness. (181 Cal.App.3d at pp. 1105-1106, 1109.) Subsequent cases have relied on these decisions without disagreement. (People v. Gutierrez (1993) 14 Cal.App.4th 1425, 1435; People v. Foster (1988) 201 Cal.App.3d 20, 25; People v. Partner (1986) 180 Cal.App.3d 178, 187.)
>
> > FN6. E.g., In re Strick (1987) 43 Cal.3d 644, 653-654 (a conviction for voluntary manslaughter does not reflect moral turpitude per se that mandates disbarment; the court must consider surrounding circumstances).
>
> The defendant simply disagrees with these decisions. For a different reason, we agree that we cannot simply apply them to the present case unthinkingly, because the premise of their analysis is no longer true.  People v. Lasko (2000) 23 Cal.4th 101, 104, and People v. Blakeley (2000) 23 Cal.4th 82, 85, found that a person who knowingly acts with a conscious disregard for the life-endangering risk of his conduct (FN7) (or who does so under the influence of a sudden quarrel or the heat of passion) is properly convicted of voluntary manslaughter even if the death of the victim was unintended.
>
> > FN7. In the classic formulation, one who throws a potted palm off the roof of a building without looking to see if anyone is on the sidewalk below

acts with an "abandoned and malignant heart." (Pen .Code, § 188.)

We do not, however, find this new least adjudicated element to be any less culpable than an intentional killing. A person who acts with callous indifference to the possibility of killing another reflects a readiness to do evil and thus might logically be found to be callously indifferent to the importance of telling the truth in a judicial proceeding. Thus, we still find that a conviction for voluntary manslaughter is admissible to impeach the credibility of a witness because it involves moral turpitude even if the underlying death was not intentional.

The defendant contends that the fact of his juvenile adjudication could not be used to impeach him in any event. He relies on People v. Lee (1994) 28 Cal.App.4th 1724, which held (after it harmonized earlier cases) that the juvenile adjudication itself is never admissible for impeachment, but the conduct underlying the adjudication is admissible for impeachment if the defendant was not honorably discharged from Youth Authority parole. (Id. at pp. 1738-1740.) (FN8)

> FN8. The case with which Lee wrestled, People v. Sanchez (1985) 170 Cal.App.3d 216, 218-219, had concluded that the language in the state Constitution which provides that "Any prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of impeachment" (Cal. Const., art. I, § 28, subd. (f), italics added) did not apply to juvenile adjudications. In dictum two years earlier discussing the potential consequences of the required express finding on the nature of a wobbler juvenile offense, the Supreme Court indicated otherwise; "the potential for prejudice from a finding of felony status has been increased [because the state Constitution] provides that any prior felony conviction, whether adult or juvenile [can be used subsequently to impeach]." (In re Kenneth H. (1983) 33 Cal.3d 616, 619, fn. 3; cited (again in dictum) in In re Manzy W. (1997) 14 Cal.4th 1199, 1208-1209.) However, the Supreme Court denied review in Sanchez. As we find the error harmless, there is no need to decide whether Sanchez (and thus Lee) was correctly decided.

In this case, the Youth Authority dishonorably discharged the defendant (as we note in section V). His testimony about the conduct underlying his adjudication was thus admissible. To the extent that he also testified about the fact of his adjudication, the admission of this evidence is harmless. The defendant's credibility was already called into question by the conduct underlying the adjudication; the incremental datum served only to apprise the jury that a court had found this conduct to be of a mitigated nature. No bias unrelated to his guilt thus resulted.

Finally, the defendant contends that the trial court abused its discretion in allowing use of the juvenile adjudication to impeach him. The criteria which inform the exercise of the court's discretion include whether the prior offense reflects on the veracity of the witness (which we have already answered in the affirmative), the degree of temporal remoteness, the degree of similarity to the present offense, and whether the potential for impeachment would prevent the witness from testifying (which is not a factor in the present case). (Castro, supra, 38 Cal.3d at pp. 307, 312.)

> Although the defendant's criminal offense occurred 12 years before the present offense,(FN9) it is not the mere passage of time but whether the previous offense represents a divide between conduct detrimental to his veracity and a subsequent blameless record. (People v. Green (1995) 34 Cal.App.4th 165, 183 [no abuse of discretion in allowing use of 20-year-old conviction where followed by a pattern of criminal conduct].) The defendant was initially released from Youth Authority custody in 1994, but his parole was revoked three times before his dishonorable discharge from parole in 1999 when he turned 25. At the time of the offense in 2002, he had been a gang member and a drug dealer. The trial court did not abuse its discretion on the issue of remoteness.
>
> > FN9. The defendant would seek to take advantage of the two-year delay between his offense and the start of his second trial in characterizing the prior offense as remote. We find this time period is not material to the analysis of remoteness.
>
> As for similarity, the prior offense was not "identical" because the motivation was significantly different, to the defendant's credit: defense of himself and his mother, albeit through the use of excessive force. Because it is not an abuse of discretion even to admit several exactly identical offenses (People v. Castro (1986) 186 Cal.App.3d 1211, 1216), the trial court's decision is within the bounds of reason under this criteria as well.
>
> We conclude the trial court did not abuse its discretion. As a result, we do not need to consider the defendant's claim of prejudice.

(Respondent's Lodged Document 7, 17-22.)

Petitioner is raising three claims regarding the use of his prior juvenile manslaughter conviction admitted for impeachment. First, he argues that under California law, a conviction for voluntary manslaughter is not admissible for impeachment because it is not a crime of moral turpitude. The California Court of Appeal found that a conviction for voluntary manslaughter is admissible under state law because it involves moral turpitude.

Federal courts are bound by state court rulings on questions of state law. Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir. 1989); Mullaney v. Wilbur, 421 U.S. 684, 691 n. 11 (1975) (determination of state law by a state appellate court is binding in a federal habeas action unless the interpretation is an "obvious subterfuge to evade consideration of a federal issue"); Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (federal habeas court must respect a state court's application of its own law and must not engage in de novo review).

The decision by the California Court of Appeal that voluntary manslaughter is a

18

1   crime of moral turpitude is not an "obvious subterfuge to evade consideration of a federal issue."

2   Accordingly, the undersigned is bound by this interpretation of state law by the California Court

3   of Appeal.

4          Petitioner's remaining two claims regarding use of the prior conviction for

5   impeachment allege violations of state law.

6          Petitioner argues that use of the prior juvenile conviction violated state law

7   pursuant to People v. Lee, 28 Cal.App.4th 1724 (1994). The California Court of Appeal rejected

8   this claim as well, finding use of petitioner's prior juvenile conviction for impeachment did not

9   violate People v. Lee because no violation of state law occurred, this claim is without merit.

10          Finally, petitioner argues that the trial court abused its discretion in allowing use

11   of the prior juvenile conviction for impeachment. The California Court of Appeal found that the

12   trial court did not abuse its discretion. For the reasons stated by the California Court of Appeal,

13   the undersigned finds that the trial court did not abuse its discretion in admitting the prior

14   conviction for impeachment and no violation of fundamental fairness occurred. Estelle v.

15   McGuire, 502 U.S. at 73.

16          The denial of this claim by the California Court of Appeal was not an

17   unreasonable application of clearly established Supreme Court authority. Accordingly, this claim

18   should be denied.

19          D.  Jury Instruction Error

20          *Legal Standard*

21          A challenge to jury instructions does not generally state a federal constitutional

22   claim. See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v.

23   Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).

24          When what is at issue is the failure to give an instruction, a petitioner's burden is

25   "especially heavy" because it has been held that "[a]n omission or an incomplete instruction is

26   less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145,

155 (1977).  Moreover, a trial judge need not instruct on a defense which would be inconsistent

with petitioner's theory of the case.  Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984).

Failure to give a jury instruction under these circumstances will not amount to a due process

violation.  Id.

The burden upon a petitioner is greater yet in a situation where he claims that the

trial court did not give an instruction sua sponte.  To the extent that petitioner rests his claim on a

duty to give an instruction sua sponte under rules of state law, petitioner has stated no federal

claim.  Indeed, in the failure to give a lesser included offense instruction context, the Ninth

Circuit has flatly held in non-capital cases that the failure to give the instruction states no federal

claim whatsoever.  James v. Reece, 546 F.2d 325, 327 (9th Cir. 1976).  Therefore, in order to

violate due process, the impact on the proceeding from failure to give an instruction sua sponte

must be of a very substantial magnitude.

Furthermore, the Supreme Court has recently held that there is no unreasonable

application of federal law where a state appellate court decided that a jury instruction's single

incorrect statement of the "imperfect self-defense" standard did not render the instruction

reasonably likely to have misled the jury.  Middleton v. McNeil, 541 U.S. 433 (2004).

*Analysis*

Petitioner argues that the trial court erred by failing to sua sponte read an

instruction limiting the jury's use of the evidence of his prior conviction for voluntary

manslaughter to impeach his veracity.  The California Court of Appeal denied this claim for the

following reasons:

> In a brief filed after oral argument, the defendant contends the trial court erred in
> failing to provide, sua sponte, an instruction limiting the jury's use of this
> evidence to impeachment of his veracity. He maintains that without such a
> limiting instruction the jury likely treated this evidence as an additional instance
> of the prior acts of domestic violence (which we discussed in the previous section)
> from which to infer a disposition for violence. He then contends that the absence
> of a limiting instruction was not harmless beyond a reasonable doubt because the
> jury's deliberations were lengthy (16 hours) and the jury in his previous trial did
> not reach a verdict (where it was unaware of the prior conviction). For several

1    reasons we reject this contention.

2    First, nothing in the argument of either counsel would have suggested to the jury
     that it could consider this evidence as another incident of domestic violence.
3    (People v. Cuevas (2001) 89 Cal.App.4th 689, 699 (Cuevas) [in deciding how
     reasonable juror would interpret instructions, may consider arguments of
4    counsel].)

5    Second, nothing in the instruction would indicate to a reasonable juror that it
     applies to the homicide of a mother's paramour. (Boyde v. California (1990) 494
6    U.S. 370, 380 [108 L.Ed.2d 316] (Boyde); People v. Kelly (1992) 1 Cal.4th 495,
     525 (Kelly).) As the instruction on the use of evidence of other incidents of
7    domestic violence explains, "Evidence has been introduced for the purpose of
     showing that the defendant engaged in an offense involving domestic violence on
8    one or more occasions other than that charged in th[is] case. [¶] Domestic
     violence means abuse committed against an adult ... who is a [ current or former ]
9    spouse ... [ or ] cohabitant ..., or person with whom the defendant has ... a child or
     ... has [ a present or former ] dating ... relationship." It would be clear to the
10   reasonable juror that the relationships to which the definition applies are all
     species of romantic involvements, and thus the reasonable juror would not extract
11   "cohabitant" in isolation (as the defendant proposes) and conclude that it refers to
     anyone with whom the defendant had ever lived, such as his mother's abusive
12   partner.

13   Finally, even if there were like-minded jurors who viewed the instruction as does
     the defendant, or who otherwise felt free to make use of his prior juvenile
14   homicide for purposes other than impeachment, the error is harmless beyond a
     reasonable doubt. The jury was otherwise aware that in general, the defendant was
15   hardly an upstanding member of the community. In particular, the numerous
     instances of domestic violence he committed against the present victim cast a dark
16   shadow over his claim of an unintentional shooting. The homicide conviction, as
     we just noted in the previous subsection, came in a context that was arguably
17   more favorable to the defendant than his acts of violence against the victim. The
     length of the present jury's deliberations (and its ability to reach a verdict, unlike
18   the prior jury) could be the result of any number of variables, and we will not
     speculate that this evidence was the superseding cause.

19

20   (Respondent's Lodged Document 7, pp. 22-24.)

21        For the reasons stated by the California Court of Appeal, the undersigned finds

22   that the trial court's failure to sua sponte give an instructing limiting the jury's use of his prior

23   juvenile conviction for voluntary manslaughter to impeach his veracity did not violate

24   fundamental fairness.  No constitutional violation occurred as a result of the trial court's failure

25   to give this instruction sua sponte.

26        The denial of this claim by the California Court of Appeal was not an

                                            21

1   unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim

2   should be denied.

3                   E.  Prosecutorial Misconduct

4                   Although somewhat unclear, as noted by respondent in the answer, petitioner

5   appears to argue that the prosecutor committed misconduct by making reference to his California

6   Youth Authority commitment and dishonorable discharge.  The background to this claim is

7   contained in the opinion of the California Court of Appeal:

8               Although the trial court allowed the prosecutor to inquire into the facts underlying
                the defendant's juvenile adjudication, it specifically ruled that the violations of the
9               defendant's juvenile parole were excluded. Nonetheless, the prosecutor asked the
                defendant whether he had been dishonorably discharged from parole; the
10              defendant asserted it was because he was unemployed. Defense counsel objected
                to the question, and the court struck the defendant's answer. Defense counsel
11              shortly afterward expressed his concern that the prosecutor had raised the subject,
                but stopped short of moving for a mistrial. Despite the efforts of the prosecutor to
12              justify his question, the court stated "it should not have been brought up." After
                talking with his client, defense counsel requested a special instruction. The trial
13              court declined to give the instruction as defense counsel had drafted it, but with
                defense counsel's assent instructed the jury as follows in the course of the pattern
14              instructions on objections and the nonevidentiary status of the attorneys'
                questions: "In this case, in a question, it was ... asked about the defendant being
15              dishonorably discharged from parole. The state of the law at that time was that a
                defendant at the age of 25 is discharged from parole. The fact that he was
16              dishonorably discharged may have to do with programs or other things that
                occurred, but this question and this fact ... was stricken by the Court and should
17              not be considered for any purpose in this case."

18              The defendant contends the inadmissible information about his dishonorable
                discharge was irremediably prejudicial. We disagree. Contrary to the defendant's
19              opinion, the testimony is not in the limited category of evidence for which
                admonitions are deemed ineffective (such as the inculpatory statement of a
20              codefendant); it is otherwise necessary to presume that a jury heeds instructions
                and admonitions, lest we court judicial anarchy. (Richardson v. Marsh (1987) 481
21              U.S. 200, 211 [95 L.Ed.2d 176]; Francis v. Franklin (1985) 471 U.S. 307, 324 [85
                L.Ed.2d 344]; Bruton v. United States (1968) 391 U.S. 123, 135 [20 L.Ed.2d
22              476].) As we reject his premised error, we do not need to consider his analysis of
                prejudice.

23

24   (Respondent's Lodged Document 7, pp. 24-26.)

25                  "To warrant habeas relief, prosecutorial misconduct must 'so infect the trial with

26   unfairness as to make the resulting conviction a denial of due process.'"  Davis v. Woodford, 384

                                                    22

1   F.3d 628, 644 (9th Cir. 2004) (brackets omitted) (quoting <u>Darden v. Wainwright</u>, 477 U.S. 168,

2   181 (1986)).  In other words, "it 'is not enough that the prosecutors' remarks were undesirable or

3   even universally condemned[,]'" <u>see</u> <u>Tak Sun Tan v. Runnels</u>, 413 F.3d 1101, 1112 (9th Cir.

4   2005) (quoting <u>Darden</u>, 477 U.S. at 181), those remarks must have had a "'substantial and

5   injurious effect or influence in determining the jury's verdict.'" <u>Sechrest v. Ignacio</u>, 549 F.3d

6   789, 808 (9th Cir. 2008) (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 622 (1993)).  "Only if

7   the record demonstrates that the jury's decision was substantially influenced by the error or there

8   is 'grave doubt about whether an error affected a jury' will [a petitioner] be entitled to relief." <u>Id</u>.

9   (quoting <u>Hegler v. Borg</u>, 50 F.3d 1472, 1478 (9th Cir. 1995) (quotation marks omitted)).

10          Although the prosecutor's question to petitioner regarding whether he had been

11   dishonorably discharged was improper, for the reasons stated by the California Court of Appeal it

12   did not substantially influence the jury's verdict.  As noted by the state appellate court, the jury

13   was instructed to disregard petitioner's testimony regarding this matter.  Juries are presumed to

14   follow instructions.  <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000) (juries are presumed to

15   follow instructions).

16          The denial of this claim by the California Court of Appeal was not an

17   unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim

18   should be denied.

19   <u>Conclusion</u>

20          For all of the above reasons, the undersigned recommends that petitioner's

21   application for a writ of habeas corpus be denied.  If petitioner files objections, he shall also

22   address whether a certificate of appealability should issue and, if so, why and as to which issues.

23   A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a

24   substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).

25          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

26   writ of habeas corpus be denied.

1    These findings and recommendations are submitted to the United States District

2    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

3    one days after being served with these findings and recommendations, any party may file written

4    objections with the court and serve a copy on all parties.  Such a document should be captioned

5    "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

6    objections shall be filed and served within fourteen days after service of the objections.  The

7    parties are advised that failure to file objections within the specified time may waive the right to

8    appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9    DATED:  August 9, 2010

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

gray1545.157

24